IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
NORTHERN DIVISION

NO. 2:14-CV-18-FL


ALAN M. DI SCIULLO, and )
MARY JO DI SCIULLO, )
)
Plaintiffs, )
)
v. ) ORDER
)
GRIGGS & CO. HOMES, INC., )
DANIEL KEN GRIGGS, and )
DEBORA R. GRIGGS, )
)
Defendants. )


This matter is before the court on the motion for partial summary judgment of defendants

Griggs & Co. Homes, Inc., Daniel Ken Griggs, and Debora R. Griggs (collectively "defendants"),

made pursuant to Federal Rule of Civil Procedure 56. (DE 57). The issues raised have been briefed

fully, and in this posture are ripe for ruling. For the reasons that follow, defendants' motion for

partial summary judgment is granted.

## STATEMENT OF THE CASE

This case involves a dispute arising from a contract for construction of a private home (the

"contract") on plaintiffs' real property located at 664 Wild Cherry Court, Corolla, Currituck County,

North Carolina (the "property"). Defendants Daniel Ken Griggs and Debora R. Griggs ("Ken and

Debora Griggs") owned and managed a construction company, defendant Griggs & Co. Homes, Inc.

("Griggs & Co. Homes"), when the parties entered into the contract on July 18, 2012. Plaintiffs,

Alan M. Di Sciullo and Mary Jo Di Sciullo ("Alan and Mary Jo Di Sciullo"), initiated this action

on March 21, 2014, contending that defendants breached the contract and fraudulently mismanaged plaintiffs' money. In particular, plaintiffs state the following claims: 1) breach of contract as to defendant Griggs & Co. Homes; 2) constructive fraud and breach of fiduciary duty as to all defendants; 3) unfair and deceptive trade practices under N.C. Gen. Stat. § 75-1.1 as to all defendants; 4) conversion as to all defendants; 5) negligence as to defendants Ken and Debora Griggs, individually; 6) in the alternative to constructive fraud, actual fraud as to all defendants; 7) accounting as to all defendants; 8) unjust enrichment as to all defendants; and 9) alter ego or mere instrumentality as to defendants Ken and Debora Griggs, individually. Plaintiffs seek compensatory and punitive damages, treble damages pursuant to N.C. Gen. Stat. § 75-16, and attorneys' fees. Defendants filed an answer and a counterclaim on July 30, 2014, seeking the unpaid balance of the contract plus costs, interest, and attorneys' fees.

On April 20, 2015, defendants filed the instant motion for partial summary judgment as to plaintiffs' second, third, fourth, and sixth claims for relief, and as to plaintiffs' fifth claim against defendant Debora Griggs as an individual. Defendants argue there is no genuine issue of material fact respecting their conduct with regard to constructive or actual fraud, unfair and deceptive trade practices, and conversion, because at all times they operated according to the terms of the parties' contract. In addition, defendants argue plaintiffs' negligence claim against defendant Debora Griggs as an individual fails as a matter of law where she interacted with plaintiffs only in her capacity as Secretary of defendant Griggs & Co. Homes.

In support of their motion, defendants rely upon the following materials: the contract (DE 58-2); plaintiffs' complaint (DE 1); depositions of defendants Ken and Debora Griggs (DE 58-8, 58-9), and plaintiffs Alan and Mary Jo Di Sciullo (DE 58-11, 58-10); emails and correspondence

between defendants' counsel and plaintiffs' counsel (DE 58-3, 58-4, 58-5); a letter notifying the Currituck Building Inspections Department of defendant Griggs & Co. Homes's withdrawal of its construction permit (DE 58-6); a list of project costs pertaining to plaintiffs' project (DE 58-7); and defendant Griggs & Co. Homes's preliminary bid proposal (DE 58-1).

On June 19, 2015, plaintiffs filed a response contending that defendants breached the contract, abused plaintiffs' trust, fraudulently misrepresented project expenses, and misappropriated plaintiffs' advance deposit. In opposition to defendants' motion for summary judgment, plaintiffs rely upon the same contract and parties' depositions as those relied upon by defendants, plus the following materials: affidavits by plaintiffs Alan and Mary Jo Di Sciullo (DE 72, 73); emails and correspondence between the parties (DE 71-4, 71-5, 71-6, 71-12, 71-13); correspondence between the parties and Rex Filion, a subcontractor who sought payment for installing kitchen cabinets (DE 71-9, 71-11); a log of subcontractors' work hours (DE 71-8); blueprints drafted by Mark Milby, a home design expert, and sealed by an engineer (DE 71-15); various billing memoranda, including a construction timeline, cost estimates, payment dates, and a list of defendants' monthly draws (DE 71-3, 71-7, 71-10); and an invoice from Renaissance Construction Company, Inc., which describes the tasks performed by the contractor that plaintiffs hired to complete the project (DE 71-14).

Defendants filed no reply, and do not move for partial summary judgment on plaintiffs' remaining claims for breach of contract, negligence by defendant Ken Griggs, accounting, unjust enrichment, and alter ego.

# STATEMENT OF FACTS

A.    Background

Plaintiffs live in New Jersey and purchased the undeveloped property located in Corolla, North Carolina, in 1998. (M. Di Sciullo Dep., DE 58-10, 29:5–7). In 2010, plaintiffs began making preparations to build their retirement home on the property. (Id. at 29:22–30:4). Plaintiffs engaged a home designer, Mark Milby, to draw preliminary plans for the home and to serve as a consultant throughout the construction process.[1] (Id. at 31:13–17, 33:10–34:12; M. Di Sciullo Aff., DE 73, ¶¶ 3, 5). Plaintiffs then used those preliminary plans in soliciting bids from four different builders, including defendant Griggs & Co. Homes. (M. Di Sciullo Dep., DE 58-10, 34:2–12, 43:22). After a series of five bid revisions, plaintiffs entered into the contract with Griggs & Co. Homes on July 18, 2012.[2] (M. Di Sciullo Aff., DE 73, ¶ 5; Contract, DE 1-1).

At the time of the contract, defendants Ken and Debora Griggs co-owned and operated Griggs & Co. Homes.[3] (D. Griggs Dep., DE 58-9, 28:5–8; K. Griggs Dep., DE 58-8, 20:3–21:11). Both owned fifty percent of the corporation's shares, and they divided duties with defendant Ken Griggs serving as President and defendant Debora Griggs serving as Secretary. (D. Griggs Dep., DE 58-9, 33:11–34:2). As President, defendant Ken Griggs supervised the corporation's construction sites and approved its financial records. (Id. 33:19–34:2). As Secretary, defendant

---

[1] Defendant Mary Jo Di Sciullo referred to Milby as a licensed designer whom she consulted "to draw the plans that would be used to build the home and to specify on the plans the type of trim that was to be in each room of the house and outside of the structure." (M. Di Sciullo Aff., DE 73, ¶ 3). Milby was not a licensed architect or engineer. (Id.).

[2] Only plaintiffs Alan and Mary Jo Di Sciullo and defendant Griggs & Co. Homes are parties to the contract. (Contract, DE 1-1). Defendant Ken Griggs signed the contract in his capacity as President of Griggs & Co. Homes, and defendant Debora Griggs's name does not appear on the contract. (Id.).

[3] Ken and Debora Griggs later divorced after this lawsuit was filed, whereupon Debora Griggs was terminated from her position at Griggs & Co. Homes and divested of her ownership interest. (D. Griggs Dep., DE 58-9, 24:4–18, 27:1–29:5).

4

Debora Griggs performed office and management tasks, such as bookkeeping and billing. (Id. at 34:17–35:20). In addition, defendant Debora Griggs assisted clients with interior decorating, including cabinetry, paint color, and light fixtures. (Id. at 34:17–23; 35:2–36:4; K. Griggs Dep., DE 58-8, 49:10–16). Defendants Ken and Debora Griggs also operated a sole proprietorship, known as D. Ken Griggs Construction, through which defendant Ken Griggs subcontracted for framing and trim work. (K. Griggs Dep., DE 58-8, 31:4–32:6). The Griggs's son, Daniel Griggs, worked for D. Ken Griggs Construction alongside defendant Ken Griggs, and defendant Debora Griggs managed the bookkeeping for that company as well. (Id. at 34:1–5, 35:4–12).

B.     The Contract

The contract is titled and described in its terms as a "cost-plus" contract.[4] (Contract, DE 1-1). Defendants' attorney prepared the contract as a form, the parties negotiated the relevant economic values, and then defendants input the values into the contract before presenting it to plaintiffs. (D. Griggs Dep., DE 58-9, 57:6–60:17). The contract estimated the project would cost $549,761.78. (Contract, DE 1-1, ¶ 9). Paragraph 4, titled, "FEE TO CONTRACTOR," provided that plaintiffs would pay a fee of $50,000.00 to Griggs & Co. Homes for its services as contractor. (Id. ¶ 4). Paragraph 4 also included a clause concerning an advance deposit: "A deposit, or advance against fees of **$55,000.00** (Fifty-five Thousand Dollars) shall be paid to Contractor upon signing

---

[4] In the context of construction projects, a cost-plus contract is a contract "in which the owner pays to the builder the actual costs of material and labor plus a fixed percentage over that amount." Black's Law Dictionary 393 (10th ed. 2014). The contract here provided: "Total cost of construction shall include all cost necessary to structure completion . . . including but not limited to: . . . Wages paid for labor in the direct employ of the Contractor[, and] . . . Cost of all materials, supplies and equipment incorporated in the work." (Contract, DE 1-1, ¶ 5-A, -D). Although the contract included a cost estimate, it specified that the estimate was "not a 'cap' or limitation of the total price, nor is it to be regarded as a warranty that costs will not exceed said amount." (Id. ¶ 9). Cost-plus contracts may be contrasted with fixed-price contracts, "in which the buyer agrees to pay the seller a definite and predetermined price regardless of increases in the seller's cost or the buyer's ability to acquire the same goods in the market at a lower price." Black's Law Dictionary 393.

of this agreement and prior to the commencement of construction." (<u>Id.</u>). In addition, the contract required Griggs & Co. Homes to use its "best skill and judgment in furthering the interests of Owner." (<u>Id.</u> ¶ 2). Finally, the contract specified that estimated job costs included "[p]ayments made by the Contractor to subcontractors for work performed pursuant to subcontractors under this agreement," and that "[a]ll portions of the work that the Contractor's organization does not perform shall be performed under subcontractors" from whom the contractor must request and select bids. (<u>Id.</u> ¶¶ 5-E, 7).

C.    Construction Process and Billing Procedure

Plaintiffs paid $55,000.00 to Griggs & Co. Homes for the advance deposit, and defendants began work on the project in September 2012. ("DiSciullo Project," DE 58-7 at 2). Defendant Debora Griggs deposited the funds into the corporation's general checking account and immediately drew upon them to pay for costs throughout the course of construction. (D. Griggs Dep., DE 58-9, 136:9–20). Meanwhile, plaintiffs proceeded under the impression that communications from defendant Debora Griggs signaled that Griggs & Co. Homes intended to preserve the advance deposit in full throughout the project, applying it only at the end of construction to satisfy any outstanding completion costs. (M. Di Sciullo Dep., DE 58-10, 388:9–24). When disputes arose over payments and the parties ended their contractual relationship they discovered that they both had operated under different interpretations of the advance deposit clause. (D. Griggs Dep., DE 58-9, 136:9–20, 138:12–15; A. Di Sciullo Aff., DE 72, ¶ 9).

The disputes leading to termination of the parties' relationship largely involved disagreements about the manner in which defendant Griggs & Co. Homes paid subcontractors and sought reimbursements from plaintiffs. As Secretary for defendant Griggs & Co. Homes, defendant

6

Debora Griggs prepared monthly statements to be sent to plaintiffs for payment. (D. Griggs. Dep., DE 58-9, 167:15–21). It was defendant Debora Griggs's usual practice to mark subcontractors' invoices as "paid" and forward them to plaintiffs for review and payment. (Id. at 164:8–166:1). Following receipt of payment, defendant Debora Griggs generally deposited plaintiffs' funds and issued pre-prepared checks to subcontractors on behalf of Griggs & Co. Homes. (Id. at 170:6–25).

However, some of the subcontractors failed to receive payment for work they had completed. (Id. at 165:4–21). For example, when one unpaid subcontractor, Carolina Custom Cabinets, appealed directly to plaintiffs for payment, plaintiff Mary Jo Di Sciullo responded that she thought that her receipt of an invoice marked "paid" from Griggs & Co. Homes signified that the subcontractor had already received its check, and therefore plaintiff Mary Jo Di Sciullo directed Carolina Custom Cabinets to request its check from defendant Debora Griggs. ("June 24, 2013 Email," DE 71-9). As a result, several subcontractors placed liens on plaintiffs' property, and plaintiffs eventually paid the liens in order to finalize a loan application for the house. (M. Di Sciullo Dep., DE 58-10, 227:12–17).

The house remained unfinished when the parties ended their contractual relationship in June 2013. (K. Griggs Dep., DE 58-8, 144:2–8). Both parties hired counsel and began a series of exchanges via email. (M. Di Sciullo Aff., DE 73, ¶ 31). One topic of dispute was the interpretation of the advance deposit clause: "We [plaintiffs' counsel] do not agree with your interpretation of the contract that the $55,000.00 your client is now holding should not be applied to the outstanding bills. In fact, we believe the contract to state the contrary." ("6.24.13 Email from Sharp to Seawell," DE 58-5). When plaintiffs requested that Griggs & Co. Homes apply the advance deposit to pay outstanding debts to certain unpaid subcontractors, defendants informed them that the advance

deposit already had been spent on plaintiffs' project and in payment to various other subcontractors. (K. Griggs Dep., DE 58-8, 155:14–23; 156:8–22). Ultimately plaintiffs did not receive their advance deposit, or any portion thereof, at the end of the project, while defendants claimed plaintiffs owed defendant Griggs & Co. Homes additional payment for unpaid billable work completed in recent months. (Id. at 155:14–23, 177:10–15). After clearing the subcontractors' liens on their property, plaintiffs hired another contractor to complete construction of the house. ("Renaissance job cost," DE 71-14).

## COURT'S DISCUSSION

A.      Standard of Review

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the initial burden of demonstrating the absence of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the nonmoving party then must affirmatively demonstrate with specific evidence that there exists a genuine issue of material fact requiring trial. Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986). Only disputes between the parties over facts that might affect the outcome of the case properly preclude the entry of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986).

"[A]t the summary judgment stage the [court's] function is not [itself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. Similarly, "[c]redibility determinations . . . are jury functions, not those of a judge." Id. at 255. In determining whether there is a genuine issue for trial, "evidence of the non-movant is to be

believed, and all justifiable inferences are to be drawn in [non-movant's] favor." Id.; see United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) ("On summary judgment the inferences to be drawn from the underlying facts contained in [affidavits, attached exhibits, and depositions] must be viewed in the light most favorable to the party opposing the motion.").

Nevertheless, "permissible inferences must still be within the range of reasonable probability, . . . and it is the duty of the court to withdraw the case from the jury when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." Lovelace v. Sherwin-Williams Co., 681 F.2d 230, 241 (4th Cir. 1982) (quotations omitted). Thus, judgment as a matter of law is warranted where "a reasonable jury could reach only one conclusion based on the evidence," or when "the verdict in favor of the non-moving party would necessarily be based on speculation and conjecture." Myrick v. Prime Ins. Syndicate, Inc., 395 F.3d 485, 489 (4th Cir. 2005). By contrast, when "the evidence as a whole is susceptible of more than one reasonable inference, a jury issue is created," and judgment as a matter of law should be denied. Id. at 489–90.

B.      Analysis

1.      Breach of Fiduciary Duty

Plaintiffs contend that defendants committed a breach of fiduciary duty or constructive fraud where the parties' contract created a fiduciary relationship and defendants unfairly took advantage of plaintiffs' absentee, out-of-state status during the course of construction.

To establish a claim for breach of fiduciary duty based upon constructive fraud, plaintiffs must show "facts and circumstances (1) which created the relation of trust and confidence, and (2) led up to and surrounded the consummation of the transaction in which defendant is alleged to have taken advantage of his position of trust to the hurt of plaintiff." Rhodes v. Jones, 232 N.C. 547, 549

9

(1950). With regard to the first element, "[c]onstructive fraud differs from actual fraud in that it is based on a confidential relationship rather than a specific representation." <u>Barger v. McCoy Hillard & Parks</u>, 346 N.C. 650, 654 (1997).

There are two types of fiduciary relationships: "(1) those that arise from 'legal relations such as attorney and client, broker and client,' . . . and (2) those that exist 'as a fact, in which there is confidence reposed on one side, and the resulting superiority and influence on the other.'" <u>S.N.R. Mgmt. Corp. v. Danube Partners 141, LLC</u>, 189 N.C. App. 601, 613 (2008) (quoting <u>Rhone-Poulenc Agro S.A. v. Monsanto Co.</u>, 73 F. Supp. 2d 540, 546 (M.D.N.C. 1999)). Plaintiffs must show at least one of these two types of fiduciary relationships because "[f]or a breach of fiduciary duty to exist, there must first be a fiduciary relationship between the parties." <u>Dalton v. Camp</u>, 353 N.C. 647, 651 (2001). With respect to contractual relationships, "parties to a contract do not thereby become each others' fiduciaries; they generally owe no special duty to one another beyond the terms of the contract and the duties set forth in the U.C.C." <u>Branch Banking & Trust Co. v. Thompson</u>, 107 N.C. App. 53, 61 (1992).

Plaintiffs do not argue that they shared a fiduciary relationship with defendants arising from a legal relation. Instead, plaintiffs seek to show a fiduciary relationship existed in fact. Both parties rely on <u>Eastover Ridge, L.L.C. v. Metric Constructors, Inc.</u>, 139 N.C. App. 360 (2000), in which the court found a non-fiduciary relationship between parties to a contract. The case involved a cost-plus contract between a property owner and a contractor. <u>Id.</u> at 362. The contract included a "Best Efforts" clause, stating: "The Contractor accepts the relationship of trust and confidence . . . and covenants with the Owner to cooperate with the Architect and utilize the Contractor's best skill, efforts and judgment in furthering the interests of the Owner." <u>Id.</u> at 362, 365. In addition, the

10

property owner in <u>Eastover Ridge</u> hired an architect to "administer the parties' agreement and oversee the project." <u>Id.</u> at 366.  The <u>Eastover Ridge</u> court found as a matter of law that the standard language of the "Best Efforts" clause was insufficient to create a fiduciary relationship where the clause was not the subject of any specific discussion between the parties, and where the close involvement of the architect "belie[d] any claim that a 'relation of trust and confidence' existed." <u>Id.</u> at 366, 367.

Defendants contend that the language in their contract's "Best Efforts" clause was more limited even than the language of the clause found insufficient to create a fiduciary relationship in <u>Eastover Ridge</u>.  Furthermore, defendants draw a number of parallels between the role of plaintiffs' home design expert, Mark Milby, and the architect in <u>Eastover Ridge</u>.  In response, plaintiffs distinguish their case from <u>Eastover Ridge</u>.  They point out that Milby was not a licensed architect and that he had limited involvement on the construction site.  Plaintiffs further argue that their out-of-state status and their fraud claims, viewed within the context of the "Best Efforts" clause, demonstrate that a genuine issue of material fact exists as to whether defendants breached a fiduciary duty.

Plaintiffs fail to show evidence sufficient to establish the existence of a fiduciary relationship.  The "Best Efforts" clause in Paragraph 2 of the parties' contract was not the subject of specific discussion, (<u>see</u> D. Griggs Dep., DE 58-9, 57:6–60:17; A. Di Sciullo Aff., DE 72, ¶ 3), and the cursory language falls short of describing a relationship of trust and confidence.  In particular, the clause in the <u>Eastover Ridge</u> contract found insufficient to create a fiduciary relationship read: "The Contractor accepts the relationship of trust and confidence established by this Agreement and covenants with the Owner to cooperate with the Architect and utilize the

11

Contractor's best skill, efforts and judgment in furthering the interests of the Owner." Eastover Ridge, 139 N.C. App. at 365. By comparison, the relevant portion of the "Best Efforts" clause in plaintiffs' and defendants' contract read: "Contractor promises to use his best skill and judgment in furthering the interests of Owner." (Contract, DE 1-1, ¶ 2).

The contract in Eastover Ridge included substantially more language related to fiduciary duties than the contract at dispute here, and the Eastover Ridge contract still was found insufficient to create a fiduciary relationship. Although plaintiff Alan Di Sciullo emphasized the "Best Efforts" clause in his deposition, (A. Di Sciullo Dep., DE 58-11, 31:3–7), that clause is insufficient to transform the parties' arm's length transaction into a fiduciary relationship. Because the "Best Efforts" clause employed broad language and was not specifically negotiated, it provides no basis for concluding that plaintiffs reposed in defendants the confidence and trust required for a fiduciary relationship.

Furthermore, plaintiffs' home designer, Milby, performed a role similar to the advisory role played by the architect in Eastover Ridge: both visited the construction site at intervals, both kept the property owner informed of the construction process, and both were hired to protect the owner from defects in construction. (M. Di Sciullo Aff., DE 73, ¶¶ 3, 7). The degree and duration of Milby's involvement before the contract was signed also mitigate against a finding of confidence and trust between the parties. Plaintiff Mary Jo Di Sciullo consulted with Milby for two years before contracting with defendants, and Milby continued to advise plaintiffs throughout the construction process, including as a de facto representative for plaintiffs during at least one on-site meeting with defendants. (Id.; M. Di Sciullo Dep., DE 58-10, 92:15–94:15).

12

To show defendants breached their fiduciary duty, plaintiffs must establish that a fiduciary relationship existed. <u>Dalton</u>, 353 N.C. at 651. Despite drawing all inferences in plaintiffs' favor with regard to the "Best Efforts" clause of the contract and Milby's involvement, the evidence shows that the parties' interactions represented an arm's length transaction with duties limited to those delineated in the contract. Accordingly, the court finds no fiduciary relationship existed and thus there was no breach of such a relationship. Therefore, defendants' partial summary judgment motion is granted as to plaintiffs' claim for breach of fiduciary duty.

2.      Actual Fraud

In the alternative to constructive fraud, plaintiffs argue defendants committed actual fraud through false misrepresentations related to 1) defendants' payment of subcontractors, 2) their treatment of the advance deposit, and 3) their general competency. A claim for actual fraud requires: "(1) False representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party." <u>Forbis v. Neal</u>, 361 N.C. 519, 526, 527 (2007) (quotations omitted).

Courts differentiate between tort and contract claims, "relegat[ing] claims regarding . . . the interpretation of an agreement to the arena of contract law." <u>Broussard v. Meineke Disc. Muffler Shops, Inc.</u>, 155 F.3d 331, 347 (4th Cir. 1998). "North Carolina law limit[s] the circumstances under which an ordinary contract dispute can be transformed into a tort action," <u>id.</u> at 345, because "awarding punitive or treble damages would destroy the parties' bargain and force the defendant to bear a risk it never took on," <u>PCS Phosphate Co. v. Norfolk S. Corp.</u>, 559 F.3d 212, 224 (4th Cir. 2009). Therefore, "[o]nly where a breach of contract also constitutes an 'independent tort' may tort

actions be pursued." <u>Strum v. Exxon Co., U.S.A., a Div. of Exxon Corp.</u>, 15 F.3d 327, 330 (4th Cir. 1994).

The independent tort exception in breach of contract cases "has been carefully circumscribed." <u>Id.</u> at 330, 331 (citations omitted). The alleged independent tort must be "identifiable" apart from the breach of contract, and "the tortious conduct must have an aggravating element such as malice or recklessness before any punitive damages may be recovered." <u>Id.</u> at 331. Even then, it is "unlikely that an independent tort could arise in the course of contractual performance, since those sorts of claims are most appropriately addressed by asking simply whether a party adequately fulfilled its contractual obligations." <u>Broussard</u>, 155 F.3d at 347 (quotations omitted).

"Ordinarily, a breach of contract does not give rise to a tort action by the promisee against the promisor." <u>N. Carolina State Ports Auth. v. Lloyd A. Fry Roofing Co.</u>, 294 N.C. 73, 81, 83 (1978), <u>rejected in part on other grounds by</u> <u>Trs. of Rowan Tech. Coll. v. J. Hyatt Hammond Assocs., Inc.</u>, 313 N.C. 230, 242, 243 (1985). This is because "the economic loss rule prohibits recovery for purely economic loss in tort, as such claims are instead governed by contract law." <u>Lord v. Customized Consulting Specialty, Inc.</u>, 182 N.C. App. 635, 639 (2007).[5] Where a tort claim rests upon an allegation that the opposing party breached a contract and caused damage to the subject matter of the contract, "a tort action does not lie against a party to a contract who simply fails to properly perform the terms of the contract, even if that failure to properly perform was due

---

[5] Courts recognize some exceptions to the economic loss rule, not applicable here, such as when: 1) injury was to a person or property of someone other than the promisee under the contract; 2) injury was to the property of the promisee other than the property which was the subject of the contract; 3) the promisor was charged by law, as a matter of public policy, with a special duty of care, such as in the case of a common carrier; or 4) the promisor willfully caused injury or conversion. <u>See</u> <u>Ports Auth.</u>, 294 N.C. at 81–83 (describing exceptions and collecting cases).

to the negligent or intentional conduct of that party." <u>Spillman v. American Homes of Mocksville, Inc.</u>, 108 N.C. App. 63, 65 (1992). In such a situation, contract law defines the obligations and remedies of the parties. <u>Id.</u>

Various types of tort claims resting upon alleged breaches of contract have failed to meet the independent tort exception. In <u>Broussard</u>, a group of franchisees brought seven different tort claims against Meineke franchisors, including fraud, negligence, and UTPA violations. 155 F.3d at 346. The claims arose from a dispute over whether the parties' franchise agreements entitled Meineke to administer the parties' common advertising fund in a particular manner. <u>Id.</u> The court described it as a "straightforward contract dispute, . . . [that] somehow managed to become a massive tort action," and found that "the district court failed to limit plaintiffs' tort claims to only those claims which are 'identifiable' and distinct from the primary breach of contract claim, as North Carolina law requires." <u>Id.</u> at 345, 346. For example, the court noted that "[t]he mere failure to carry out a promise in contract . . . does not support a tort action for fraud." <u>Id.</u> at 346 (quotations omitted). In addition, the court held that, "[g]iven the contractual center of this dispute, plaintiffs' UTPA claims are out of place." <u>Id.</u> at 347. North Carolina courts have found that even intentional breaches of contract are insufficient to support an independent tort action if nothing more is alleged. <u>Se. Shelter Corp. v. BTU, Inc.</u>, 154 N.C. App. 321, 330 (2002) (quotations omitted); <u>see</u> <u>Branch Banking & Trust Co.</u>, 107 N.C. App. at 62.

If the evidence surrounding a breach of contract claim does not support an independent tort, then the claim is governed by contract law. Courts treat extrinsic evidence relating to the terms of an agreement between parties according to N.C. Gen. Stat. § 25-2-202. For example, "[a] course of performance . . . is relevant in ascertaining the meaning of the parties' agreement, may give

particular meaning to specific terms of the agreement, and may supplement or qualify the terms of the agreement." N.C. Gen. Stat. § 25-1-303(d). Similarly, "if the writing itself leaves it doubtful or uncertain as to what the agreement was, parol evidence is competent, not to contradict, but to show and make certain what was the real agreement between the parties." Root v. Allstate Ins. Co., 272 N.C. 580, 590 (1968).

The first basis for plaintiffs' fraud claim, namely alleged misrepresentations arising from defendants' procedure for paying subcontractors, more properly provides the basis for a claim in contract. Under the parties' contract, all work not completed by defendants was to be completed by subcontractors that defendants selected, and all payments defendants made to subcontractors were to be included in the total cost of construction. (Contract, DE 1-1, ¶¶ 7, 5-E). The parties' understanding of these arrangements evolved throughout their contractual relationship, and both parties approach the fraud claim by relying upon representations they made to one another during the contract's course of performance. (Pls.' Resp. in Opposition to Defs.' Mot. at 13, 14, DE 71; Defs.' Mem. in Support of Mot. at 19–21, DE 58). Defendants explain that they performed the payment process by stamping invoices from subcontractors as "paid," forwarding the stamped invoices to plaintiffs, and then delivering checks to subcontractors after receiving payment from plaintiffs. Plaintiffs respond that some subcontractors did not receive payment, and they argue that defendants fraudulently misrepresented the billing process by marking unpaid invoices as "paid."

Defendants' alleged misrepresentations fail to qualify as an independent tort. This basis for the fraud claim is not "identifiable" apart from plaintiffs' contract claim, see Strum, 15 F.3d at 331, because defendants made the representations in conjunction with their course of performance and based upon an interpretation of their rights and obligations under the contract. Defendants'

16

representations are analogous to the alleged threats in PCS Phosphate Co., which the court found to be "nothing more than [the defendant] stating that it believed it had a separate legal right." 559 F.3d at 224. Here, defendants' representations regarding their billing procedure similarly may be viewed as their interpretation of legal rights and obligations under the contract. While such representations might be evaluated as potential evidence bearing on plaintiffs' claim for breach of contract, they do not give rise to an independent claim for fraud. Furthermore, plaintiffs fail to show "substantial aggravating circumstances" surrounding the alleged fraud. See id. at 214. Taking as true plaintiffs' allegation that defendants intentionally conducted and misrepresented a fraudulent billing process, a tort action still does not lie against a party who failed to properly perform the terms of a contract, even where the failure was intentional. Spillman, 108 N.C. App. at 65.

Plaintiffs' second basis for their fraud claim rests upon defendants' treatment and representations of the advance deposit. As with the subcontractor payment procedure, this disagreement also may be traced back to the parties' contract. Both parties base their arguments upon interpretations of the advance deposit clause, particularly the meaning of the description, "[a] deposit, or advance against fees." (Contract, DE 1-1, ¶ 4). In interpreting this clause, the parties point to correspondence they exchanged with one another after entering into the contract and during the course of its performance. (Pls.' Resp. in Opposition to Defs.' Mot. at 12, DE 71; Defs.' Mem. in Support of Mot. at 18, 19). For example, plaintiffs' counsel wrote to defendants' counsel: "We do not agree with your interpretation of the contract that the $55,000.00 your client is now holding should not be applied to the outstanding bills. In fact, we believe the contract to state the contrary." ("6.24.13 Email from Seawell to Sharp," DE 58-5).

Even viewed in a light most favorable to plaintiffs, allegations that defendants failed to retain in full the advance deposit, and misrepresented their treatment of it, are insufficient to support plaintiffs' claim of fraud. See Broussard, 155 F.3d at 346 ("The mere failure to carry out a promise in contract . . . does not support a tort action for fraud."). Such allegations are not separately identifiable apart from a claim for breach of contract. In Broussard, the court considered franchisees' claim for fraudulent mismanagement of a common advertising account that was governed by the parties' franchise contract. Id. The court found that the tort claim "really arises out of [the franchisor's] performance on the contract, not out of the type of distinct circumstances necessary to allege an independent tort." Id. at 347. Similarly, plaintiffs' claim that defendants misinterpreted and fraudulently misrepresented the advance deposit is inseparable from their claim for breach of the contract. As in Broussard, defendants acted according to their "interpretation of [the] agreement" and its course of performance. Id. The proper context for considering such evidence is plaintiffs' claim for breach of contract, not their claim for fraud. See id.; N.C. Gen. Stat. § 25-2-202. In addition, plaintiffs fail to allege substantial aggravating circumstances. "Something more" than mere breach is required to support an independent tort, and, as in Broussard, "given [the franchisor's] plausible argument for an interpretation of the [franchise agreement] that validates its conduct, that something more seems lacking here." 155 F.3d at 346. Taking as true plaintiffs' allegations that defendants mishandled the advance deposit and misrepresented their treatment of it, they still fail to show substantial aggravating circumstances. Because plaintiffs' claim is not separately "identifiable," and it does not allege substantial aggravating circumstances, it does not support an independent tort. Therefore, plaintiffs' second basis for fraud fails.

In sum, plaintiffs' first and second bases are insufficient to establish a claim for fraud where the parties' contract and its course of performance are the real sources of dispute.

Plaintiffs' third basis concerns defendants' general representations of competency in construction, including that they possessed the skill and ability to deliver a house according to specifications and within budget. This broad basis for the fraud fails for lack of particularity. "In all averments of fraud, duress or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." N.C. R. Civ. P. 9(b). The particularity requirement may be met by alleging "time, place and content of the fraudulent representation, identity of the person making the representation and what was obtained as a result of the fraudulent acts or representations." Terry v. Terry, 302 N.C. 77, 85 (1981).

Plaintiffs' Response and Complaint fail to allege with sufficient particularity the time, place, and content of defendants' fraudulent misrepresentation as to competency. Although presumably representations as to competency occurred at the beginning of negotiations, "[m]ere allegations of 'fraud by hindsight' will not satisfy the requirements of Rule 9(b)." Harrison v. Westinghouse Savannah River Co., 176 F.3d 776, 784 (4th Cir. 1999) (quoting Hillson Partners Ltd. Partnership v. Adage, Inc., 42 F.3d 204, 209 (4th Cir. 1994)). Furthermore, plaintiffs fail to describe with particularity the content of defendants' misrepresentation. Aside from alleging that defendants claimed "experience, competence, ability, and financial resources," plaintiffs describe only specific construction problems and fail to describe defendants' prior representations. (Complaint, DE 1 at 12, 13). Therefore, plaintiffs' third basis for fraud fails for lack of particularity.

As a result, defendants' partial summary judgment motion is granted as to plaintiffs' claim for actual fraud.

19

3.      Unfair and Deceptive Trade Practices

Plaintiffs argue defendants' conduct under the contract and their abuse of superior knowledge regarding construction practices constituted unfair or deceptive trade practices in violation of N.C. Gen. Stat. § 75-1.1 et seq. To establish a claim under the Unfair and Deceptive Trade Practices Act, plaintiffs must show: "(1) [the] defendant committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff." Bumpers v. Cmty. Bank of N. Virginia, 367 N.C. 81, 88 (2013) (quotations omitted). An unfair or deceptive act or practice is one in which a party "engages in conduct which amounts to an inequitable assertion of its power or position." Johnson v. Phoenix Mut. Life Ins. Co., 300 N.C. 247, 264 (1980).

Where breach of contract is the only underlying act for a UDTPA claim, courts have held that "a mere breach of contract, even if intentional, is not sufficiently unfair or deceptive to sustain an action under N.C.G.S. § 75-1.1." Se. Shelter Corp., 154 N.C. App. at 330 (quotations omitted); see Branch Banking & Trust Co., 107 N.C. App. at 62. As noted previously, plaintiffs relying upon a breach of contract in this context must show "substantial aggravating circumstances," Se. Shelter Corp., 154 N.C. App. at 330, and even then such claims likely are misplaced, "since those sorts of claims are most appropriately addressed by asking simply whether a party adequately fulfilled its contractual obligations," Broussard, 155 F.3d at 347.

Principles applied above as to the fraud claim apply equally in the context of UDTPA claims. In PCS Phosphate Co., a plaintiff mine owner attempted to show "substantial aggravating circumstances" sufficient to support an independent tort arising from a defendant rail carrier's alleged breach of contract. 559 F.3d at 214. The plaintiff argued that the defendant committed

unfair and deceptive trade practices when it threatened to cut off essential rail access to the plaintiff's mine during a dispute over rail line relocation costs. Id. at 224. The Fourth Circuit Court of Appeals disagreed, describing the tort claim as "an attempt to multiply the damages for an ordinary breach of an agreement by re-characterizing the breach as a violation of the UDTPA." Id. Instead, the court found that "these alleged threats are nothing more than [the defendant] stating that it believed it had a separate legal right to abandon its own tracks." Id.

In Bartolomeo v. S.B. Thomas, Inc., 889 F.2d 530 (4th Cir. 1989), the Fourth Circuit Court of Appeals found insufficient cause for a violation of the Unfair and Deceptive Trade Practices Act ("UDTPA") where the defendant abruptly abandoned a contract, failed to deliver products, delayed reimbursements, and even reclaimed some products after terminating the contract. Id. at 535, 536. Similarly, in Taylor v. U.S., 89 F. Supp. 3d 766 (E.D.N.C. 2014), this court found that a doctor's allegations that a state healthcare system improperly terminated his accreditation, changed its position contrary to its initial acceptance of his application, and made threats of collection activity against him, amounted to a dispute over the parties' rights and obligations under their contract. Id. at 774. As a result, the doctor's allegations failed to state a basis for a UDTPA claim. Id. at 773, 774.

Plaintiffs' first two arguments for a UDTPA violation rely upon a finding of fraud or constructive fraud,[6] and the court finds those arguments inapposite for reasons explained previously. Plaintiffs assert a third, independent argument that defendants violated the UDTPA through inequitable assertion of their knowledge about construction practices and their control over project

---

[6] (Pls.' Resp. in Opposition to Defs.' Mot. at 18, DE 71). In Hardy v. Toler, 288 N.C. 303, 309 (1975), the court held that "[p]roof of fraud would necessarily constitute a violation of the prohibition against unfair and deceptive acts; however, the converse is not always true."

costs. Defendants contend that there was no inequitable assertion because plaintiff Mary Jo Di Sciullo closely monitored all construction work and approved payment on many of the monthly invoices and subcontractor costs. As found in the previous two sections of analysis, the parties' construction practices constituted performance of the contract, and management of project costs was governed by the contract and informed by its course of performance.

Moreover, plaintiffs fail to describe conduct amounting to substantial aggravating circumstances attending the alleged breach of contract. Drawing all inferences in favor of plaintiffs, an assertion that defendants abused their position by overcharging plaintiffs still is insufficient evidence of an unfair or deceptive trade practice. Where the underlying claim rests upon plaintiffs' claim for breach of contract and the interpretation thereof, defendants' conduct is far less severe than the conduct found insufficient for a UDTPA violation in Bartolomeo. See 889 F.2d at 535, 536. Therefore, plaintiffs fail to establish that a genuine issue of material fact exists as to defendants' violation of the UDTPA, and defendants' motion for partial summary judgment is granted on this point.

4.    Conversion

Plaintiffs argue defendants committed conversion with respect to the advance deposit and payments to subcontractors. Conversion is "an unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the alteration of their condition or the exclusion of an owner's rights." Anderson v. Sara Lee Corp., 508 F.3d 181, 190 (4th Cir. 2007) (quotations omitted); see Peed v. Burleson's, Inc., 244 N.C. 437, 439 (1956). To be successful in a claim for conversion, plaintiffs must "maintain a right of possession of the property superior to that of the alleged converter from the time of the disputed action through the time of

22

suit." Synergy Fin., L.L.C. v. Zarro, 329 F. Supp. 2d 701, 708 (W.D.N.C. 2004). Where breach of contract is the underlying conduct for a claim of conversion it follows that there must have been a breach in order for the assumption of the right of ownership to be unlawful. See id. ("[W]here the exercise of right of ownership is done pursuant to the terms of a contract, no cause of action for conversion will lie."). Finally, as noted previously, the alleged claim must be identifiable apart from the breach and must involve substantial aggravating circumstances in order to satisfy the independent tort exception. Strum, 15 F.3d at 331.

Defendants argue that plaintiffs fail to state a claim for conversion because there was no unauthorized assumption of ownership over plaintiffs' funds where defendants applied the advance deposit in a manner consistent with the advance deposit clause. Plaintiffs disagree with defendants' interpretation of the clause, and contend that defendants failed to produce sufficient accounting records to establish that they employed the advance deposit solely for plaintiffs' project. Plaintiffs also allege defendants sent invoices marked "paid" for subcontractor services that actually went unpaid. Defendants deny the conversion claim by relying on their reading of the contract terms, and they cite correspondence between the parties to support their reading. (Defs.' Mem. in Support of Mot. at 16, DE 58). Plaintiffs' arguments similarly are grounded in contract interpretation, including an alternative reading of the advance deposit clause. (Pls.' Resp. in Opposition to Defs.' Mot. at 19, DE 71).

Plaintiffs' conversion claim and defendants' arguments are tied to competing interpretations of the contract. As described above, treatment of the advance deposit and payment of the subcontractors both are delineated in the contract. The claim here resembles Broussard in that it arises from contract terms governing funds that the plaintiffs paid to the defendants. See 155 F.3d

23

at 346.  Here, plaintiffs' argument does not focus on ownership of the funds, see Peed, 244 N.C. at 437 (listing the third element of conversion as "chattels . . . belonging to another"); instead, it centers on whether defendants managed the funds according to the contract, (Pls.' Resp. in Opposition to Defs.' Mot. at 19, DE 71) ("[T]he money was to be held by Defendants to cover the completion costs . . . . [and] to pay subcontractors.").  Allegations that defendants misinterpreted the contract and concomitantly mismanaged payments, even if taken as true, are not separately identifiable from a claim for breach of contract.  See Broussard, 155 F.3d at 346, 345.  Therefore, plaintiffs' claim fails to satisfy the independent tort exception.  As a result, defendants' motion for partial summary judgment is granted as to plaintiffs' claim for conversion.

5.     Negligence as to Defendant Debora Griggs

Plaintiffs allege defendant Debora Griggs owed plaintiffs a duty as Secretary of defendant Griggs & Co. Homes, and that she breached the applicable standard of care in performing that duty with respect to plaintiffs' construction project.  (Complaint, DE 1 at 12).  As noted above, "[o]rdinarily, a breach of contract does not give rise to a tort action by the promisee against the promisor."  Ports Auth., 294 N.C. 73 at 81.  "The economic loss rule prohibits recovery for purely economic loss in tort, as such claims are instead governed by contract law."  Lord, 182 N.C. App. at 639.

Defendants contend defendant Debora Griggs interacted with plaintiffs only in her capacity as Secretary of defendant Griggs & Co. Homes, and only as a result of the corporation's contract with plaintiffs.  The court agrees that the record reflects this assessment.  For example, plaintiffs allege defendant Debora Griggs wrote correspondence, paid subcontractors, and drafted an addendum to the contract.  All of these actions fell within the scope of her duties as Secretary.  (See

D. Griggs Dep., DE 58-9, 34:17–35:20). Furthermore, plaintiffs allege defendant Debora Griggs's

"duties to Plaintiffs . . . were charged by the Contract and by the Contractor to perform duties for

Plaintiffs' benefit." (Complaint, DE 1 at 12). In other words, defendant Debora Griggs's duties

toward plaintiffs arose solely from the contract. Taken together, the evidence shows that her

involvement with plaintiffs' construction project was limited to her duties as Secretary of defendant

Griggs & Co. Homes. Accordingly, defendant Debora Griggs cannot be liable individually for

negligence. Therefore, defendants' motion for partial summary judgment is granted as to plaintiffs'

negligence claim against defendant Debora Griggs as an individual.

## CONCLUSION

Based on the foregoing discussion, defendants' motion for partial summary judgment, (DE

57), made pursuant to Federal Rule of Civil Procedure 56, is GRANTED as to plaintiffs' claims for

breach of fiduciary duty, unfair and deceptive practices, conversion, fraud, and negligence as to

defendant Debora Griggs as an individual. Plaintiffs' claims for breach of contract, accounting,

unjust enrichment, alter ego, and negligence as to defendant Ken Griggs as an individual remain

outstanding.

The parties are DIRECTED to file a joint status report contemplating the scheduling of

remaining case activities, also including the utility of any further alternative dispute resolution,

within fourteen (14) days of entry of this order. Said report also should include, among other things,

the estimated length of trial and proposed term(s) for trial.

SO ORDERED, this the 22nd day of October, 2015.

_____
LOUISE W. FLANAGAN
United States District Judge